**UNITED STATES of America**

**v.**

**Thomas Anthony CERASO, Appellant in No. 72–1279, et al.**

**Appeal of Beverly CERASO, in 72–1280.**

**Appeal of John E. TROUTMAN, in 72–1284.**

**Nos. 72–1279, 72–1280 and 72–1284.**

United States Court of Appeals, Third Circuit.

Argued July 11, 1972.

Decided Aug. 16, 1972.

Anthony D. Miele, Fierro & Miele, Williamsport, Pa., and Arthur K. Dils, Harrisburg, Pa., for appellants.

John J. Robinson, Appellate Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before ALDISERT, MAX ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

Appellants Thomas Anthony Ceraso, Beverly Ceraso and John E. Troutman were tried to a jury and convicted under a two-count indictment charging them with conducting a book-making operation in the Williamsport, Pennsylvania,

area in violation of 18 U.S.C. § 1955[1] and with conspiring for that purpose as prohibited by 18 U.S.C. § 1371.[2] All three appellants submitted motions for a new trial, and the Cerasos also filed a motion for acquittal. The district court denied the requests, and we affirm.

The Cerasos and Troutman have filed separate briefs on this appeal, so that some questions have been raised only by the Cerasos or Troutman, but not by both. However, they join in their first contention that the Government failed to prove a violation of Section 1955 and that the verdict was against the weight of the evidence. On reviewing the motion for acquittal, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government. . . ." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942);

United States v. Blair, 456 F.2d 514, 517 (3d Cir. 1972).

Most of the Government's evidence at trial came from recordings of telephone conversations authorized under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. § 2510 et seq. The telephones, which were subscribed to by Thomas Ceraso, were monitored between February 17 and February 21, 1971. During that time, appellants, along with others, placed and received calls distributing the betting "line"[3] and receiving wagers on various sporting events.

At trial, tapes of the conversations were played for the jury and Special Agent Charles Fahien of the FBI identified the voices that had been recorded. The Cerasos regularly took bets, and Troutman regularly relayed the line to them. The Cerasos then transmitted the

---

1. 18 U.S.C. § 1955 reads in part as follows:

Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) 'illegal gambling business' means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
. . .

2. Appellants are three of thirteen individuals indicted for operating a bookmaking business in Williamsport, Pennsylvania, in February 1971. One defendant, William Becker, was charged

only with conspiracy. All others were charged on both counts. Prior to trial, the indictment was dismissed as to three defendants. Two defendants waived a trial by jury and agreed to stipulate to the admissibility against them of evidence that the United States would introduce at the trial of their co-defendants. The case of Frank Casale was severed. At the trial of the remaining seven, appellants were found guilty. However, the jury was unable to agree to the guilt or innocence of defendants Lloyd Bosch, William Becker, Anthony Leta and Joseph Casale. The district court then granted Leta's motion for acquittal. The other defendants who were granted a mistrial, along with Frank Casale, then moved to suppress the wire-tap evidence that had been used on the ground that the application for the wire-tap was in violation of provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Their motion was granted, and the Government has appealed that order. No. 72–1355, 467 F.2d 647. Because of the common question of the validity of that wire-tap the appeals of the Cerasos and Troutman were heard at the same time as the Government's appeal. However, because of the additional issues raised in this case, we have written separate opinions in the two cases.

3. "Betting line" information is either betting odds or point spreads on sporting events used in the making of wagers.

information to others. In addition, there was a regular series of lay off bets between the Cerasos and Troutman.

Other indicted co-conspirators were shown to be involved in the operation. In one taped conversation, Thomas Ceraso reported the status of the operation to Lloyd Bosch, and received instructions from him. Joseph Casale, the bartender at the Cerasos' bar, Frankie's Tavern, was overheard receiving the "line" from Beverly Ceraso, passing it on to gamblers, and taking bets. These bets were laid off to James Berrigan, and the tape of this conversation revealed that Casale requested Berrigan to give Ceraso some "action" for a commission.

The Government also produced additional evidence of the book-making operation. Thomas Ceraso's telephone toll records were introduced, as were various basketball news sheets and schedules found in a search of the tavern. It was also shown that some of the long-distance calls were billed to William Becker, whose telephone records were seized and introduced. An FBI agent testified that he had received calls on Troutman's telephone when they arrested him. During the period three callers asked for the line and four placed bets. Finally, Special Agent Boyd testified that on February 20, 1971, the total bets placed on three telephones subscribed to by Thomas Ceraso were $6230, including $500 placed on outgoing calls.

In order to prove that Section 1955 was violated, the Government must show not only that there was a gambling operation in violation of state law, but that it was conducted, financed, managed, supervised, directed, or owned by at least five people and that it operated substantially continuously for at least thirty days or had more than $2000 gross revenue in any single day.

Appellants first argue that the Government failed to show the requisite five people conducting, financing, supervising, directing, or owning the operation. They point out that when the statute originally passed the Senate on January 26, 1970, it stated that five people need merely participate in the gambling. However, that language was later dropped in the final bill, indicating that anyone merely placing a bet could not be counted as one of the five people who had to be involved in the operation. Starting from this point, appellants argue that at best the Government proved that only two people, Thomas and Beverly Ceraso, conducted the bookmaking.

■ The evidence indicated that a jury could reasonably have found otherwise. Troutman and Joseph Casale both gave information on the "betting line" and took bets. Those acts are clearly within the concept of conducting a bookmaking operation. Although "conduct" is nowhere defined in the statute, the authors of simultaneously-enacted 18 U.S.C. § 1511, which was to parallel Section 1955, intended "conduct" to mean any participation in the operation of a gambling business. H.R.Rep.No.91–1549, 91st Cong. 2d Sess. (1970), 1970 U.S.Code, Cong. & Admin.News, pp. 4029–30. *See*, United States v. Becker, 461 F.2d 230, at 232 (2d Cir. filed May 30, 1972), United States v. Riehl, 460 F. 2d 454 (3d Cir. filed May 9, 1972).

Becker's payment of the telephone bills could have reasonably been found to have made him one of the financial backers of the operation, or at least a participant, and Bosch's conduct in receiving information and giving instructions to Thomas Ceraso gave the jury evidence of his supervising or managing the operation.

■ The appellants next argue that the district court was in error in charging that the "gross revenue" specified in the statute means the total of the wagers placed during a day. They contend that the proper definition of the term is the amount of profit received during the period. If they are correct, then the Government failed in its proof on this point because it only adduced evidence that some $6320 was wagered during February 20, 1971.

The legislative history indicates that Congress contemplated that the $2000 figure would refer simply to the amount wagered in any one day. Throughout the discussion of the legislation, many Congressmen relied heavily on the Report of the President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society.* The report used the term "gross revenue" to indicate the amount that it believed was wagered during any one period in the United States. It carefully distinguished that figure from the profit it believed organized crime made on such activity. *Id.,* at 189. During the debate, Congressmen picked up this terminology, and used the term "gross revenue" to mean the total amount bet.[4] Most significantly, Senator Hruska, who added the provision relating to syndicated gambling to the Organized Crime Statute, stated:

> The suggested standard for determining that such an operation is of sufficient size to warrant Federal intervention is entirely reasonable and practicable. Any *bookmaking or numbers operation which does more than $2000 in business in one day* . . . must have a substantial adverse effect in the flow of moneys and goods in interstate commerce. (emphasis supplied) 115 Cong.Rec. 10736 (1969).

The concern of Congress was the amount of daily business transacted by gamblers, not the sum of their profits.

It is a severe task for the Government to obtain sufficient evidence to sustain any convictions under any definition of gross revenue.[5] It would complicate their task enormously if they had to attempt to show the net profits from such an operation in any one day. Gambling records are obviously not public documents. The amount of profits could generally be proven only by seizure of carefully secreted files. The interpretation suggested by appellants would render the enforcement of this statute a mockery. We, therefore, conclude that there was sufficient evidence to sustain the conviction and that the verdict was not against the weight of the evidence.

■ Notwithstanding the proof, appellants urge that the statute as written is unconstitutional because it exceeds the power given to Congress to control activities which affect interstate commerce. They assert that the matter is properly reserved to the states and cannot be regulated under the Commerce Power. However, their argument is foreclosed by the Supreme Court's recent opinion in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971),[6] upholding the federal loan-shark statute, 18 U.S.C. § 891, against a similar challenge.

Appellants' argument is also foreclosed by the ample evidence given to Congress showing the serious effects of gambling on interstate commerce. The

4. *See, e. g.,* Remarks of: Congressman Poff, 116 Cong.Rec. 35294 (1970); Senator Allott, 116 Cong.Rec. 603–04 (1970); Senator Byrd, 116 Cong.Rec. 606 (1970); Senator McClellan, 115 Cong.Rec. 5873 (1969), 116 Cong.Rec. 590 (1970).

5. S.Rep.No.91–617, 90th Cong. 1st Sess. (1969), which accompanied S. 30, the original version of the Act, acknowledged that it was difficult to prove the proportion of the total operations of a gambling enterprise.

6. Justice Douglas, writing for the Supreme Court in Perez v. United States, 402 U.S. 146, 155, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), notes specifically that Congress relied at least in part on the statistics

and conclusions of the Report by the President's Commission on Law Enforcement and Administration of Justice entitled The Challenge of Crime in a Free Society. He found that the information presented was sufficient to sustain Congress' conclusion that such activities affected interstate commerce. The same information was relied on by the Congress in writing the gambling provisions of the Organized Crime Control Act of 1970 at issue here. There is no reason to consider the report any less probative value in the area of gambling, so that the Supreme Court's approval of the findings in Perez could largely answer any questions raised in this case without further inquiry.

Report of the President's Commission on Law Enforcement and Administration of Justice, supra, at 188–89, stated that "gambling is the greatest source of revenue for organized crime." It noted that estimates of the total amount bet through organized crime's facilities each year varied from $7 billion to some $50 billion. All of this activity was accomplished by an intricate system of local, regional, and national "lay-off-men," who through the use of the facilities of interstate commerce, captured the substantial bankroll which has been used to "infiltrate legitimate businesses and labor unions, to harm investors and competing businesses, and to corrupt the democratic process."[7]   Schneider v. United States, 459 F.2d 540, at 542 (8th Cir., filed April 12, 1972). As we previously noted,[8] Congress placed great reliance on the report and the findings it contained.[9] We find that this information was a sufficient rational basis for the conclusion that gambling produced serious detrimental effects on interstate commerce. Further, Congress acted within its authority because the means selected for controlling this evil are reasonably related to the effectuation of the end sought to be achieved. Perez v. United States, supra; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941). We agree with the other courts which have already ruled on this question that Section 1955 is within the power granted the Federal Government under the Commerce Clause. Schneider v. United States, supra; United States v. Becker, supra; United States v. Palmer, 465 F.2d 697 (6th Cir. 1972); United States v. Aquino, 336 F. Supp. 737 (E.D.Mich.1972); United States v. Politi, 334 F.Supp. 1318, 1322 (S.D.N.Y.1971); United States v. Harris, 332 F.Supp. 315 (N.D.Tex.1971).

Appellants' next point of attack is the decision of the district court barring them from contesting the validity of the wire-tap application and order from

---

7. The Organized Crime Control Act of 1970, 84 Stat. 922, sets forth the Congress' findings about the pervasive effect of organized crime on interstate commerce: "The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact."

8. See note 4, supra.

9. Remarks of Senator Allott, 116 Cong. Rec. 604 (1970), dealt with the effect on interstate commerce:

   In addition to being largely the creature of organized crime and its principal source of revenue, illegal gambling both involves and affects interstate commerce. People, information, funds and paraphernalia, without which gambling enterprises could not be conducted, move regularly across interstate lines. Moreover, by diverting expenditures from ordinary lines of commerce into its own coffer, gambling distorts the production of goods for commerce and the flow of goods in interstate commerce. These interstate aspects of gambling make it an appropriate subject of concern to the Federal Government.

which came much of the incriminating evidence used at trial. The appellants did not attack the wire-tap order prior to trial. On January 24, 1972, they filed a post-trial motion to suppress the evidence on the ground that the authorization did not meet the requirements of 18 U.S.C. § 2516(1).[10] The Government opposed the motion as untimely under F.R.Crim.P. 41(e). Appellant failed to respond. The district court thereupon found the motion untimely.

 F.R.Crim.P. 41(e) states that "[t]he [suppression] motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing." The clear implication of the language of the rule, and the requirements of any efficient judicial system, necessitate strict adherence to this rule in any but the most unusual circumstances. Bartlett v. United States, 317 F.2d 71 (9th Cir. 1963), cert. denied, 375 U.S. 847, 84 S.Ct. 102, 11 L.Ed.2d 75 (1964); United States v. Nirenberg, 19 F.R.D. 421 (E.D.N.Y.1956). The district court found no such mitigating factors present in this case, and appellants have presented none to us on this appeal. In addition, the appellants failed to respond to the Government's objection to their request for a suppression, and they may not now be permitted to complain about the subsequent court action.

However, even if we were to rule otherwise on the timeliness of suppression motion, we have found that the application for a wire-tap in this case complied with the statutory commands of 18 U.S. C. §§ 2516(1), 2518(1)(a), 2518(4)(d).

United States v. Casale, 467 F.2d 647 (3d Cir. 1972).

Appellant Troutman has raised a variety of claims with regard to incorrect evidentiary rulings by the trial court. We have examined his contentions on each such matter and find them without merit.

The order denying the motions for a new trial and the motion for acquittal will be affirmed.

---

10. 10. Although former Attorney General Mitchell personally reviewed the application for authorization for a wire-tap in this case, he did not sign the letter sent to the field approving the request to the courts. Instead, the letter was sent out over the signature of then Assistant Attorney General Will Wilson, who had been authorized by the Attorney General to approve the application. However, Wilson did not actually sign the letter, and in fact he never saw the file. It was instead handled by his Deputy, Harold Shapiro. Section 2516(1) requires that the Attorney General, or a specially designated Assistant Attorney General, approve each wire-tap application. Appellants contended that the procedure used in their case did not comply with the statute.