UNITED STATES of America

v.

Louis VIGNOLA.

Crim. No. Cr. 78–242.

United States District Court,
E. D. Pennsylvania.

Jan. 8, 1979.

Alan M. Lieberman, Theodore A. McKee, Philadelphia, Pa., for Government.

Thomas A. Bergstrom, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

The defendant, Louis Vignola, was appointed President Judge of the Philadelphia Traffic Court in January 1974. On July 21, 1978, the Government filed a five-count indictment [1] charging Vignola with racketeering in violation of the "RICO" [2] statute, and with attempted tax evasion [3] and the filing of false federal income tax returns. [4] The defendant moved before trial to dismiss the RICO count (Count I) and to sever that count from the tax counts. After hearing oral argument we denied those motions.

During the trial a question arose as to the legality of the procedures employed by the prosecution in obtaining disclosure of the defendant's tax returns from the Internal Revenue Service. We believed that an evidentiary hearing might well be necessary to resolve this dispute, a hearing we were reluctant to hold in the midst of a trial before a sequestered jury. The defendant then moved for, and we granted, a mistrial and a severance as to the tax counts.

The jury then convicted the defendant of violating the RICO statute. He has now moved for a judgment of acquittal or for a dismissal of the RICO count, for arrest of judgment, and for a new trial. For the following reasons we will deny these motions.

## I. FACTUAL BACKGROUND

The RICO statute, *inter alia*, prohibits

" . . . any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . "

18 U.S.C. § 1962(c). The statute defines a "pattern of racketeering activity" as consisting of at least two acts of "racketeering activity", 18 U.S.C. § 1961(5), and sets forth a list of offenses which constitute such activity. Among these offenses is

"any act or threat involving . . . bribery, . . . which is chargeable under State law and punishable by imprisonment for more than one year . . . "

18 U.S.C. § 1961(1).

The indictment in this case alleged that the defendant, as President Judge of the Traffic Court, had the power to appoint and remove writ-servers to execute arrest warrants issued by the Court. [5] As compensation, the writ-servers received a statutorily-prescribed flat fee for each warrant they served; [6] the more warrants they executed the more money they earned.

The original indictment set forth over sixty-six instances [7] in which the defendant had allegedly "solicited, accepted, and agreed to accept a pecuniary benefit" from certain named writ-servers, "as consideration for the defendant's decision, recommendation and other exercise of discretion as a public servant, and as consideration for a violation of a known legal duty as a public servant," in violation of 18 Pa.C.S.A. § 4701, the Pennsylvania bribery statute. The in-

---

1. A superseding indictment was filed on October 13, 1978, adding to the list of the defendant's alleged acts of racketeering; the substantive charges were not changed.

2. Racketeer Influenced and Corrupt Organizations, 18 U.S.C. § 1961 *et seq.*

3. 26 U.S.C. § 7201.

4. 26 U.S.C. § 7206(1).

5. 17 P.S.: § 712.10.

6. *Id.*

7. As noted in footnote 1, *supra*, the superseding indictment added to this list; in the actual indictment submitted to the jury, we of course deleted those alleged acts of bribery as to which the Government presented no testimony or with respect to which there was inadequate proof to sustain the Government's burden.

dictment charged that these acts of bribery constituted a pattern of racketeering activity, that the defendant was employed by or associated with an enterprise [the Traffic Court] engaged in, or the activities of which affected, interstate commerce, and that he conducted the affairs of this enterprise through a pattern of racketeering activity, thus violating RICO.

At trial, former writ-server Edwin Lynch, the Government's main witness, testified that he had had a deal with the defendant to make certain monthly and weekly payments to the defendant in order to keep his job, to have warrants channeled to him, and to "fix" traffic tickets.[8] Lynch explained that he would write checks to "cash" in order to generate funds with which to pay the defendant, and that he or members of his family and staff would deliver this cash in envelopes to the defendant's home or office. Lynch identified numerous checks as being the ones he had written in order to generate cash for the pay-offs. He was able to make these identifications on the basis of such annotations as "Judge" or "J. Personal" on the check stubs or scraps of paper he kept with his checks. Lynch's testimony was corroborated by those members of his family and staff who had made deliveries of the monies, and who, on occasion, had endorsed the checks to generate cash.

Writ-server Charles Vare testified for the Government that he and the defendant had had a deal pursuant to which Vare would pay the defendant $1 for each warrant he was given to serve. Vare said that he had made approximately five payments to the defendant of $125 to $250 in cash.

We believe that there was ample evidence for the jury to find beyond a reasonable doubt that the defendant had solicited and accepted bribes. The defendant does not seriously challenge the sufficiency of the evidence as to the bribery; rather, he has challenged his conviction as encompassing racketeering activity not falling within the ambit of RICO.

## II. MOTION FOR JUDGMENT OF ACQUITTAL; MOTION TO DISMISS COUNT I; MOTION FOR ARREST OF JUDGMENT

■ The defendant's initial claim is that the Philadelphia Traffic Court is not an "enterprise" within the meaning of the RICO statute. We reject this contention as contrary to the plain language of RICO, which defines an enterprise as including

"*any* individual, partnership, corporation, association, or *other legal entity*, and any union or group of individuals associated in fact although not a legal entity",

18 U.S.C. § 1961(4) [emphasis added]. As a creature of statute, 17 P.S. § 712.1 *et seq.*, the Philadelphia Traffic Court is a "legal entity" and is therefore an "enterprise" for the purposes of RICO.

■ The defendant argues, however, that Congress did not intend RICO to apply to the judiciary, and, in enacting RICO, was not concerned with corruption of that branch of government. We disagree. RICO was enacted as Title IX of the Organized Crime Control Act of 1970; the over-all purpose of that Act is to combat so-called "organized crime", which Congress viewed as a spreading cancer in American society.[9] The major thrust of the 1970 Act is to rid the American economy and the channels of interstate commerce from the influences of "organized crime". Congress has chosen to accomplish this objective not by proscribing the elusive status of "organized crime", but by prohibiting certain behavior, such as syndicated gambling and racketeering, which it has concluded is commonly engaged in by

---

8. According to his testimony, Lynch began paying the defendant $600 a month in December 1974, in order to keep his job. This sum was later increased to $800 a month, and the payments continued well into 1977. Lynch also stated that he had paid the defendant $100 a week to "fix" tickets for him, and that, at the defendant's request, he had given the defendant five color television sets.

9. *See* Congressional Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 922–923 (1970).

members of "organized crime".[10] This does not mean, however, that Congress intended the 1970 Act to apply *exclusively* to members of "organized crime", and, of course, the Government need not prove that a RICO defendant is a member of "organized crime". *See United States v. Mandel*, 415 F.Supp. 997, 1018–19 (D.Md.1976).

■ RICO, or Title IX of the 1970 Act, is aimed at removing racketeering influences from enterprises engaged in, or the activities of which affect, interstate commerce. Through RICO, Congress hoped to reduce the burden placed upon interstate commerce by racketeers, and, to that end, Congress has given "enterprise" the broad definition previously quoted. This definition makes no exception for public entities such as the judiciary, nor do we find any basis in the legislative history for implying one.[11] Indeed, in adopting the 1970 Act, Congress expressed a particular concern for the subversion and corruption of "our democratic processes" and the undermining of the "general welfare of the Nation and its citizens" by "organized crime". Congressional Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 923.[12]

Congress has specifically directed that RICO be "liberally construed to effectuate its remedial purposes . . . " Pub.L. No.

91–452, § 904, and the courts have recognized and given effect to that mandate. They have been in near-unanimity in rejecting challenges to the characterization of a particular entity as an "enterprise", and have held, for example, that the Pennsylvania Bureau of Cigarette and Beverage Taxes,[13] the Pennsylvania State Senate,[14] a municipal police department,[15] and the Philadelphia Redevelopment Authority[16] are all enterprises within the meaning of RICO.[17]

The Third Circuit, in a case involving an executive agency, rejected the argument that RICO is inapplicable to government entities, stating that

" . . . Congress' concern was enlarging the number of tools with which to attack the invasion of the economic life of the country by the cancerous influences of racketeering activity; [footnote omitted] Congress did not confine its scrutiny to special areas of economic activity. Congress had no reason to adopt a constricted approach to the solution of the problem. Congress was concerned with the infiltration of organized crime into the American economy and to [sic] the devastating effects that racketeering activity had upon it. [footnote omitted] Yet, we are asked to believe that Congress' approach to a monumental problem

---

**10.** *United States v. Forsythe*, 560 F.2d 1127, 1136 (3d Cir. 1977) ["The legislative intent was to make RICO violations dependent upon behavior, not status."]; *United States v. Mandel*, 415 F.Supp. 997, 1018 (D.Md.1976).

**11.** We recognize, of course, as did the Fifth Circuit in *United States v. Brown*, 555 F.2d 407, 415 n. 15 (1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), that RICO is "plain on its face" and therefore "recourse to legislative history is unnecessary." However, as did the Fifth Circuit, we refer to the legislative history to show that "there is ample evidence to indicate that the congressional focus [in enacting RICO] was not as narrow" as the defendant claims. 555 F.2d at 415.

**12.** We note also that Congress has included within the definition of racketeering activity the offense of bribery, a crime which is peculiar to public officials, including judges.

**13.** *United States v. Frumento*, 563 F.2d 1083 (3d Cir. 1977), *cert. denied sub nom. Millhouse*

*v. United States*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978).

**14.** *United States v. Cianfrani*, Cr. No. 77–412 (E.D.Pa. Bench op. of Becker, J., filed December 16, 1977).

**15.** *United States v. Brown*, footnote 11, *supra.*

**16.** *United States v. Salvitti*, 451 F.Supp. 195 (E.D.Pa.1978); *aff'd*, 588 F.2d 822 (3d Cir. 1978).

**17.** *But see United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976), holding that the State of Maryland is not an "enterprise". We believe, however, that this conclusion was rejected by our Court of Appeals in *Frumento, supra*, and that, in any event, the State of Maryland may be distinguished from the Philadelphia Traffic Court as being "a totally amorphous and intangible notion." *United States v. Cianfrani, supra*, at 10.

besetting the country was myopic and artificially contained. Is it conceivable that in considering the evermore widespread tentacles of organized crime in the nation's economic life, Congress intended to ignore an important aspect of the economy because it was state operated and state controlled? We think not. Congress declared that the provisions of Title IX 'be liberally construed to effectuate its remedial purposes.' 84 Stat. 947." *United ·States v. Frumento,* 563 F.2d 1083, 1090–91 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978).

Judge Becker found this reasoning controlling in *United States v. Cianfrani,* Cr. No. 77–412 (E.D.Pa. Bench op. filed December 16, 1977), and declined to create a RICO exception for a state legislative body. We also find *Frumento* controlling. Most courts, in varying degrees, do have an effect upon the economy and upon interstate commerce; those who interpret and apply the law can indeed work major changes upon the economy. In trying to cleanse the American economy of the subversive influence of racketeering activity, there is no reason why Congress should have excluded the judiciary from its protective and remedial statutory scheme. The judiciary is as vulnerable to the evils of corruption as any other entity, public or private. We see no reason to read into RICO an exception for that branch of government, nor do we believe Congress intended to create one. We therefore hold that the Philadelphia Traffic Court is an "enterprise" within the meaning of RICO.

**18.** The Government met its burden in this regard through uncontroverted testimony that the Philadelphia Traffic Court maintains an "out-of-state" department to collect fines assessed against owners of cars registered out-of-state which have been ticketed in Philadelphia, that drivers whose out-of-state cars have been towed by the Philadelphia Police must go to the Traffic Court and pay all outstanding fines before they can get their cars back, that a large automobile leasing company located in Baltimore, Maryland, has paid fines to the Traffic Court, and that the Traffic Court had a contract with a New Jersey computer firm to provide print-outs of scofflaws.

The defendant's next contention is that RICO requires the Government to prove not only a connection between the enterprise named in the indictment and interstate commerce, but also between the defendant's pattern of racketeering activity and commerce, and that the Government has failed to prove the latter nexus in his case. We disagree with the defendant's interpretation of RICO, and for the following reasons hold that the Government need not prove that a defendant's racketeering activity in any way affected interstate commerce.

First, the express language of the statute itself requires that the Government prove only that the named *enterprise* be one engaged in, or the activities of which affect, interstate (or foreign) commerce. 18 U.S.C. § 1962.[18] This specific requirement, coupled with RICO's silence as to the need for any link between a defendant's racketeering activity and interstate commerce, can only mean that Congress intended RICO to apply to racketeering activity with no proven connection to interstate commerce except in connection with an enterprise which itself affects interstate commerce. Indeed, if the defendant's argument were correct, then the requisite nexus between the enterprise and interstate commerce would be surplusage. Certainly if Congress had intended that the Government prove a connection between the defendant's racketeering activity and interstate commerce it would have said so. Congress clearly is able to express such a statutory requirement between proscribed behavior and commerce when one is intended.[19]

**19.** *See, e. g.,* the Hobbs Act, 18 U.S.C. § 1951(a): "Whoever in any way or degree obstructs, delays, or *affects commerce . . by robbery or extortion . . .* shall be fined . . . or imprisoned . . ." [emphasis added]. Also, if Congress had meant for RICO to apply *only* to racketeering activity which itself affects commerce, *it would have been* unnecessary to include extortion within the definition of racketeering activity, 18 U.S.C. § 1961(1)(A), since extortion which affects commerce was already prohibited by the Hobbs Act.

Second, the legislative history [20] of the 1970 Organized Crime Control Act indicates a congressional intent to reach *all* patterns of racketeering activity engaged in by persons employed by or associated with enterprises whose activities affect interstate commerce. This does not mean that RICO was meant to, nor does it, punish purely state law violations. There is a legitimate federal interest in preventing the corruption and subversion of interstate enterprises, and it is this corruption which RICO seeks to eradicate. The defendant in this case has not been subjected to trial in federal court because he has violated state bribery laws, but because he has corrupted and weakened an enterprise whose activities affect interstate commerce.[21]

■ It is beyond question that the power of Congress to regulate interstate commerce includes the power to regulate *intrastate* activities which have an effect upon interstate commerce. *United States v. Perez*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). However, in determining whether a federal statute enacted under the Commerce Clause may properly be applied to a particular individual's *intrastate* activity, the courts do not look to the effect upon commerce of that specific activity, but employ a "class of activities" test. *Perez, supra*, and cases cited therein; *United States v. Riehl*, 460 F.2d 454 (3d Cir. 1972).

Under this test, we must determine what *class* of activities Congress has regulated, and whether that class is within reach of the federal power. *Perez, supra.* In so deciding, our inquiry is limited to determining whether Congress had a rational basis for finding that the regulated activity affects commerce, and, if it had such a basis, whether the means selected to regulate the activity are reasonable and appropriate. *United States v. Sacco*, 491 F.2d 995 (9th Cir. 1974) (*en banc*); *United States v. Ceraso*, 467 F.2d 653 (3d Cir. 1972).

■ The class of activity that RICO clearly regulates is that *class* of racketeering activity engaged in by persons associated with enterprises whose activities affect interstate commerce. In enacting RICO, Congress found that this class of activity "burden[s] interstate and foreign commerce . . . and undermine[s] the general welfare of the Nation and its citizens . .". Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 923 (1970). The legislative history of the Organized Crime Control Act of 1970 (and of RICO) supports a finding that Congress had a rational basis for this conclusion. *See* S.Rep. No. 617, 91st Cong., 1st Sess. (1969). We also find that the means by which Congress has chosen to rid the channels of commerce of racketeering influences (*i. e.*, by focusing on the racketeer's influence upon enterprises engaged in, or the activities of which affect, commerce), are rational and appropriate, and that RICO is therefore a proper exercise of the federal commerce power. *Cf. Ceraso, supra*, (reaching the same conclusion with respect to RICO's companion statute, 18 U.S.C. § 1955).[22]

20. *See* footnote 11, *supra.*

21. *See, e. g., Westfall v. United States*, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927), in which the officer of a state bank which was a member of the Federal Reserve System challenged his federal conviction for conspiring to misapply the funds of his bank. He argued that there had been no loss to the Federal Reserve Banks, an argument which can be analogized to the defendant's here that his bribery has not affected interstate commerce. In affirming Westfall's conviction, Mr. Justice Holmes, writing for a unanimous Court, stated that ". . . every fraud like the one before us weakens the member bank and therefore weakens the System." 274 U.S. at 259, 47 S.Ct. at 629.

22. For those who are uncomfortable with the "class of activities" test, we note that RICO at least requires some proven connection between the racketeer and interstate commerce. Other criminal statutes which the courts have had little trouble in upholding are silent as to *any* nexus between the defendant, the proscribed activity, and interstate commerce; one such statute, the anti-gambling provision of the 1970 Organized Crime Control Act, 18 U.S.C. § 1955, is a companion to RICO. It has survived nu-

Our sole remaining inquiry is to determine whether the defendant's racketeering activities are within the class regulated by RICO. Since they clearly are, his conviction is proper.[23] The defendant's vigorous argument that he may not lawfully be convicted under RICO because his bribery was purely local in effect must fail under the "class of activities" test. Once we have concluded that Congress may validly regulate the class of racketeering activity engaged in by persons associated with interstate enterprises, and that the defendant's conduct falls within this class, the magnitude and effect of his conduct are irrelevant, since we are powerless to " 'excise, as trivial, individual instances' of the class." *Perez, supra,* 402 U.S. at 154, 91 S.Ct. at 1361 [citations omitted]; *Sacco, supra; United States v. Meese,* 479 F.2d 41 (8th Cir. 1973);[24] *Riehl, supra.*

The defendant has cited *United States v. Forsythe,* 560 F.2d 1127 (3d Cir. 1977), in support of his argument that RICO requires proof of a connection between his racketeering activity and interstate commerce. The relevant language in that case is as follows:

> "RICO is a federal law proscribing various racketeering acts which have an effect on interstate or foreign commerce. Certain of those racketeering, or predicate acts violate state law and RICO incorporates the elements of those state offenses for definitional purposes. State law offenses are not the gravamen of RICO offenses. RICO was not designed to punish state law violations; it was designed to punish the impact on commerce caused by conduct which meets the statute's definition of racketeering activity."

560 F.2d at 1135. We do not believe, however, that *Forsythe* dictates a result contrary to that which we have reached.

First, the quoted passage is *obiter dictum* and therefore is not binding upon us.[25] It followed a discussion by Judge Van Dusen as to whether the period of limitations of a RICO prosecution is governed by federal or state law. Judge Van Dusen concluded that because Congress did not enact as part of RICO a proposed section providing that certain racketeering activity would be defined as "continuing" and therefore not governed by the general *federal* statute of limitations, that Congress intend-

merous challenges to its validity under the Commerce Clause. *See, for example, Sacco, supra; United States v. Meese,* 479 F.2d 41 (8th Cir. 1973); *Ceraso, supra.*

**23.** Our holding disposes of defendant's argument that his conviction violates the Ninth and Tenth Amendments to the United States Constitution. Since we have determined that Congress has the power under the Commerce Clause to regulate his racketeering activities, the power to do so is not one which is reserved to the states, or to the people. *See United States v. Garrison,* 348 F.Supp. 1112 (E.D.La. 1972).

**24.** In *Meese,* the defendant was convicted of gambling in violation of 18 U.S.C. § 1955, the companion to RICO. He challenged his conviction on the basis that "his gambling business was a small one and located within a single county in Missouri; hence, he argue[d], his illegal activities [were] not within the intended scope of the statute." 479 F.2d at 43. In rejecting this argument, the court stated that "In view of our finding that § 1955 is constitutional and since defendant is within the prohibited class, we *do not consider the magnitude of* the particular activity charged since we are

without power 'to excise as trivial, individual instances of the class.' " *Id.*

**25.** "It is a maxim not to be disregarded, that *general expressions,* in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but *ought not to control the judgment in a subsequent suit when the very point is presented for decision.* The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.
*Cohens v. Virginia,* 6 Wheat. 264, 399–400, 5 L.Ed. 257 (1821) (Marshall, C. J.) [emphasis added]; *United States v. Zuskar,* 237 F.2d 528 (7th Cir. 1956), *cert. denied sub nom. Budzileni v. United States,* 352 U.S. 1004, 77 S.Ct. 564, 1 L.Ed.2d 549 (1957); *Ingo v. Koch,* 127 F.2d 667 (2d Cir. 1942); *Coen v. American Surety Co. of New York,* 120 F.2d 393 (8th Cir.), *cert. denied,* 314 U.S. 667, 62 S.Ct. 128, 86 L.Ed. 534 (1941).

ed the *federal* statute of limitations to govern in all RICO cases. Judge Van Dusen then went on to describe RICO in the very general language quoted above, his point being that RICO expresses the *federal* interest in ridding commerce of racketeering influences, and that the statute's reference to state law violations is purely definitional.

·Any suggestion in *Forsythe* that RICO proscribes only racketeering activity which itself directly affects commerce was not necessary to the opinion. The court in *Forsythe* was not asked to decide, nor did it decide, the question whether RICO required the Government to prove a nexus between a defendant's racketeering activity and interstate commerce. It did not consider RICO in terms of that question, and we believe that when the statute and its legislative history are scrutinized with that precise issue in mind, the proper conclusion is the one which we have reached.[26]

In any event, we believe that the quoted passage in *Forsythe* can be harmonized with our conclusion, since it can be interpreted as stating that RICO proscribes racketeering activity which as a *class* affects interstate commerce, through the statutorily-required connection between racketeers and enterprises engaged in interstate commerce. As we have already noted, the Third Circuit has recognized that Congress intended RICO to be liberally construed, and it has so construed it. *Frumento, supra*, 563 F.2d at 1090–1091. *Forsythe* itself approves of a liberal construction of RICO, 560 F.2d at 1135–1136, and to read *Forsythe* as the defendant suggests would greatly constrict the scope of RICO, rendering it much narrower than Congress intended it to be. We therefore hold that RICO requires no proof that the defendant's racketeering activity in any way affected interstate commerce, and we deny the defendant's motion for judgment of acquittal, motion to dismiss Count I, and motion for arrest of judgment.

---

**26.** Similarly, the court in *United States v. Frumento, supra*, which the defendant also cites, was not confronted with the question now before us, and its opinion cannot be taken as a holding that RICO requires the interstate commerce connection which the defendant suggests it does.

## III. MOTION FOR A NEW TRIAL

The defendant's motion for a new trial is based on the following claims of error: the admission of out-of-court declarations by writ-server Barry Simmons, the admission of out-of-court declarations by, and references to, former Pennsylvania State Senator Henry "Buddy" Cianfrani, a comment by us that defense counsel's cross-examination of government witness Richard Croft was "irrelevant", and the inclusion of the tax counts in the indictment. We will examine each of these claims in turn.

### A. The out-of-court statements of Barry Simmons

██ Barry Simmons was a Traffic Court writ-server named in the original and superseding indictments as having paid bribes to the defendant. Simmons was seriously ill and hospitalized at the time of trial and was not called as a witness by the Government. Instead, the Government elected to drop as predicate acts those bribes allegedly paid by Simmons, and to excise them from the indictment submitted to the jury.

Nevertheless, the Government called as witnesses Barney Cummins and William Grubb, former deputy writ-servers to Simmons. They described how Simmons had taken them to the Traffic Court to be sworn-in by the defendant, and testified that Simmons had told them that he had to pay the defendant $500 for each swearing-in. They further testified that they saw Simmons put money in an envelope, place that envelope on a cigar box, and leave the box and envelope on the defendant's desk prior to the swearing-in.

Testimony concerning Simmons' payments to the defendant was properly admitted under Fed.R.Evid. 404(b) as "other crimes" evidence tending to prove the manner in which the defendant participated in the conduct of the Traffic Court, the "en-

terprise" named in the indictment. Specifically, the testimony concerning Simmons was probative of the defendant's purpose in accepting money from his writ-servers, and added to the proof that he conducted the affairs of the Traffic Court through a pattern of racketeering activity, *i. e.,* bribery.

However, the defendant objected to, and now asserts as a basis for a new trial, the admission of the out-of-court statements of Simmons as hearsay. We admitted those declarations under the "state of mind" exception to the hearsay rule, Fed.R.Evid. 803(3), and believe our ruling was correct. Simmons' statements that he had to pay the defendant in order to have Grubb and Cummins sworn-in explain his motive for leaving money with the defendant, and the defendant's intent in accepting it. Such "state of mind" testimony is relevant in cases of bribery, since it proves which of the many possible reasons (*e. g.,* gift, loan repayment) explains a particular giving and acceptance of money. *United States v. Davis,* 576 F.2d 1065 (3d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 119, 58 L.Ed.2d 132 (Oct. 2, 1978). *Cf. Lawlor v. Loewe,* 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 (1915) ("state of mind" testimony admissible to explain reasons for customers' ceasing to deal with sellers). The hearsay statements of Barry Simmons were thus properly admitted.

### B. *Statements of, and references to, "Buddy" Cianfrani*

The defendant asserts as error the admission of all testimony referring to "Buddy" Cianfrani, including the admission of out-of-court statements made by Cianfrani, who was not called as a witness. Cianfrani, the defendant's nephew, is himself a convicted felon, and the defendant argues that the testimony concerning Cianfrani "served no other purpose than to inflame the jury's latent prejudices toward political and public officers" and was more prejudicial than probative. We disagree.

The first references at trial to Cianfrani were made by Government witness Lynch. Lynch testified on direct examination that in January 1974, when the defendant was appointed President Judge of the Traffic Court, he, Lynch, was asked to return to the Traffic Court all the warrants he had in his possession, an indication to Lynch that he was about to lose his job as a writ-server. .Lynch then went to see the defendant, who told him,

"I'm probably going to keep you, but before I can keep you you have to go see 'Buddy' [Cianfrani], and make a deal and Buddy has to call me and say, 'O.K.,' and then you can go back to work."

Lynch Testimony ["Lynch"] at 11. Lynch went to see Cianfrani and they struck a deal requiring Lynch to pay Cianfrani $400 a month, the amount to be increased "if he [Lynch] did good."

Lynch then returned to the defendant's office and told the defendant that he had "seen Buddy and . . . made a deal"; [27] the defendant then gave him his work back. Lynch went on to describe that he began paying Cianfrani monthly, writing checks to "cash" and then having the money delivered to Cianfrani. Lynch further testified that in December 1974, the defendant

"called me into his office and said he didn't want me to pay Buddy any more; that he was having a hard time catching up to Buddy to get his half."

Lynch at 32. Lynch expressed a desire not to "get in no trouble with Buddy," to which the defendant replied, "look, I'm the boss at traffic court, not Buddy. Buddy may be Blood, but I'm the boss; I'm the only one that can hire and fire you." Lynch at 33–34. Lynch then began paying money to the defendant, rather than to Cianfrani.

The testimony concerning Cianfrani was relevant because it "set the stage" for proof of the specific racketeering activity charged in the indictment; it explained how Lynch came to be paying bribes to the defendant. The evidence was relevant and admissible since "[i]t is well established that it is ap-

---

27. Lynch at 16.

propriate to show the course of conduct leading to the events which form the basis of the crime charged." *United States v. Adcock*, 558 F.2d 397, 401 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

The specific out-of-court statements made by Cianfrani himself were properly admitted under the co-conspirator exception to the hearsay rule enunciated in *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). In that case, the Third Circuit held that a defendant need not be charged with conspiracy in order for the hearsay statements of his co-conspirator made in furtherance of the conspiracy to be admissible against him, so long as the Government proves, by a preponderance of the evidence, that a joint undertaking existed at the time of the statements. The court cautioned that this "common enterprise cannot be established solely by the words of the self-proclaimed participant . . ." 542 F.2d at 627.

We believe that there was sufficient evidence in this case to support the finding that Cianfrani and the defendant conspired to solicit and receive bribes. This conspiracy was proven *not* solely by the out-of-court statements of the self-proclaimed participant (Cianfrani), but by the in-court testimony of Lynch and by those who testified that they had delivered envelopes containing cash to Cianfrani's office at the request of Lynch.[28] Cianfrani's hearsay statements were thus correctly admitted under *Trowery.*

■ We do not believe that the testimony concerning Cianfrani was more prejudicial than probative, as the defendant contends. Without this testimony, the jury would not have understood how Lynch came to be making pay-offs to the defendant; his explanation would have described only a part of a larger scheme, and might therefore have lacked credibility. We find that the entire testimony concerning Cianfrani was thus relevant and probative.

As to the possible prejudice created by this testimony, we note that the prospective jurors were carefully examined during the *voir dire*, by defense counsel and by us, as to their prejudices against public officials in general and Cianfrani in particular. They were also asked if they would be prejudiced against this defendant because of his relationship to Cianfrani. Those who expressed affirmative answers to these questions were excused from the jury. Unless the *voir dire* is a meaningless exercise, we must conclude that the jury in this case was composed of twelve persons who had sworn to appraise the defendant's conduct solely on its own terms, and not to be influenced by the defendant's status as a public official nor by his relationship to "Buddy" Cianfrani. We think that the *voir dire* minimized the possibility that the defendant would be prejudiced by the testimony concerning Cianfrani, that any prejudice to the defendant which did result from this testimony did not outweigh its probative value, and that the testimony was properly admitted.

### C. Comment on the cross-examination of Richard Croft

■ Richard Croft, now a 21-year old public accountant, did clerical work for Lynch when he was in high school. Croft testified for the Government that Lynch had often asked him to buy candy and cigars and deliver them in a bag to the defendant's house. Frequently, Croft said, he saw Lynch put cash into a white envelope and place the envelope in the bag for

---

**28.** The defendant argues that the conspiracy was not proven by a preponderance of the evidence since Lynch himself was in doubt as to the payments he made to Cianfrani. However, we think the defendant has misconstrued Lynch's testimony. On direct examination, Lynch identified six checks which he said he had written to generate the cash to pay Cianfrani. On cross-examination, he admitted that he had borrowed money from one Lou Bonaventura, that he was paying interest in amounts equal to those of the checks, and that perhaps those *particular* checks had been used to generate cash to pay the interest. But Lynch never denied the fact, nor doubted, that he had paid money to Cianfrani in 1974, and that he had done so in order to keep his job.

delivery to the defendant. At times Croft himself had obtained this money by cashing checks for Lynch, the latter explaining to him that "I need money for the Judge." Croft testified that he had made approximately eight to twelve deliveries to the defendant's house, and that on some occasions had given the bags to the defendant himself.

On cross-examination, defense counsel established that Croft was a friend of the Lynch family, and particularly of Edwin Lynch's son, Guy. We stopped the cross-examination when counsel sought to elicit from Croft testimony as to whether he had ever testified on behalf of Guy Lynch in any civil suits, and we commented that the cross-examination was irrelevant. Defendant claims that this comment was in error and warrants the granting of a new trial.

Our comment was not error; the cross-examination *was* irrelevant since it sought only to establish that Croft had a bias in favor of Edwin Lynch. Lynch, however, was not a party to the prosecution, but a mere witness; he had (as far as the jury and we knew) no stake in the outcome of the case and so any bias Croft may have had toward Lynch was indeed irrelevant.

### D. *Joinder of the tax counts and the RICO count*

The defendant's final claim is that the inclusion of the tax counts in the indictment severely prejudiced him by placing before the jury "other serious violations of federal law . . .". In essence, this claim represents a renewal of defendant's pre-trial motion for severance, a motion which we have already denied. As we noted in our oral denial, in determining whether to hold separate trials on the different crimes charged in the same indictment, the principal consideration "is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial [and prosecutorial] economy." *United States v. Brashier*, 548 F.2d 1315, 1323 (9th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977); *United States v. Kulp*, 365 F.Supp. 747, 765 (E.D. Pa.1973), *aff'd* 497 F.2d 921 (3d Cir. 1974).

The crux of defendant's claim of prejudice in this case is that the jury was more likely to convict him of one crime (the RICO violation) because he was also charged with another (violating the tax laws). Such a claim is in general based upon the fear that the evidence introduced to prove one crime will unjustifiably be used to establish a defendant's "criminal propensity", and thus lead to his or her conviction for the other crime.

However, any prejudice to this defendant resulting from the joinder of charges would not have been alleviated by separate trials, since the evidence necessary to prove the allegations of the RICO counts and of the tax counts would have been essentially the same, had the tax counts gone to the jury. That is, in order for the Government to have proved the defendant guilty of attempted tax evasion and the filing of false tax returns, it would have had to show that the defendant had received unreported income. Since the Government charged that this unreported income was generated by the racketeering activity proved under the RICO count, proof of the racketeering activity would have been admissible under the tax counts as well, had they been submitted to the jury. The only additional evidence which would have been introduced under the tax counts would have been the defendant's income tax returns.

This cross-admissibility of evidence would have diluted any prejudice resulting from the joinder of the RICO and tax charges, since the latter would have required the introduction of virtually no new evidence. Indeed, it is not at all uncommon for a defendant to be charged in one indictment, and prosecuted in a single trial, for both an income-generating offense and for a tax offense associated with the non-reporting of that income. Such cases are legion. Also, given the cross-admissibility of evidence, severance of the RICO count from the tax counts in this case would merely have resulted in two separate trials consisting of essentially the same evidence, an unnecessary burden upon judicial and prosecutorial

economy. Thus, our initial decision not to sever the tax counts was a correct one, and has not been rendered prejudicial to the defendant by the fact that, as it turned out, the tax counts were not placed before the jury.

Only three brief references to the alleged tax law violations were made to the jury: (1) during *voir dire*, when we explained the nature of the charges against the defendant, (2) in the Government's opening statement, when the prosecutor merely mentioned the tax counts but devoted his entire opening to describing the defendant's racketeering activity, and (3) in our charge, in which we explained to the jury that the tax counts had been severed for legal reasons and instructed the jurors not to speculate as to what had happened to those counts. If the defendant suffered any prejudice at all (and we do not believe that he did) because of these passing references to the tax charges, that prejudice did not outweigh the valid considerations supporting our initial denial of severance, and did not rise to the level of injustice which would require us to grant a new trial.

In conclusion, finding no merit in any of the defendant's claims of error, we deny his motion for a new trial.