UNITED STATES of America, Appellee,

v.

Dennis GEORGE, Appellant.

UNITED STATES of America, Appellee,

v.

Donald Eugene HONEYCUTT, Appellant.

UNITED STATES of America, Appellee,

v.

James W. BARR, Appellant.

Nos. 77–1079 to 77–1081.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 8, 1977.

Decided Jan. 10, 1978.

John B. Whitley, Charlotte, N. C., for appellant Dennis George.

Gerald R. Chandler, Albemarle, N. C., for appellant Donald Honeycutt.

Gary A. Davis, Charlotte, N. C., for appellant James Barr.

Douglas M. Martin, Sp. Asst. U. S. Atty., Charlotte, N. C. (Keith S. Snyder, U. S. Atty., Asheville, N. C., on brief), for appellee.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The three appellants, Dennis George, Donald Eugene Honeycutt and James Watson Barr, were named in a twenty count indictment which charged them, and others,[1] with conducting an illegal gambling business and with conspiracy to commit that offense in violation of 18 U.S.C. 1955,[2] and 18 U.S.C. § 371.[3] Following a jury trial, each appellant was convicted on several substantive counts and of conspiracy. The principal question for review is whether there was presented at trial sufficient evidence to sustain these convictions. We affirm the convictions of George and Honeycutt but reverse the conviction of Barr.

The government's primary evidence at trial consisted of tapes of the court authorized wire interceptions of conversations conducted between December 19, 1975 and January 5, 1976 on three telephones located in the residence of Fred Orr Snider, a bookmaker in Gastonia, North Carolina. Agents of the Federal Bureau of Investigation identified the voices that had been recorded.

Gambling records and paraphernalia seized at George's residence in Rock Hill, South Carolina, and a tape of 14 telephone conversations between George and Snider were introduced into evidence against George, who for purposes of this appeal

---

1. Appellants are three of eleven individuals originally charged with violating 18 U.S.C. § 1955 and 18 U.S.C. § 371. Of the eleven, five defendants, namely Fred Orr Snider, Lowell Edwin Miller, Paul Sustare Steele, Henry Tyson Leonard, and Jimmy Pierce Leonard entered pleas of guilty to one or more counts. All charges were dismissed as to one defendant, Lee Pressley Snider. The remaining five defendants entered pleas of not guilty. Defendant Louyn Edward Summerford was tried with George, Honeycutt and Barr. He was convicted and appealed, but has since withdrawn his appeal. The eleventh defendant, Leonard Lee Thompson, Jr., was separately tried by the Court and convicted, and has entered a separate appeal.

2. This statute provides, in relevant part:

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

"(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or number games, or selling chances therein."

3. This statute provides, in relevant part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

admits to being a bookmaker. Although no bets were made or discussed during these conversations, all of which were initiated by George over a period of 18 days, Snider provided "line information"[4] to George upon request. In the course of two such conversations, the following exchanges took place:

George: "Number 7?

Snider: I got Miami 4½. Better make Miami of Ohio 4½.

George: They played South Carolina (unintelligible).

Snider: 4 then. Yeah."

\* \* \* \* \* \*

George: "How about that LA? Any changes?

Snider: "No. It's 6. Are they playing on St. Louis?

George: "Playing on St. Louis. A fellow here has got it 5, and another fellow has got it scratched.

Snider: "He has? Make it 5½ then.

George: "That's what I'll do (unintelligible)."

On numerous occasions in September and October of 1975, government agents undertook surveillance of Louyn Summerford, an associate cf Snider's. During this period Summerford established a pattern of making telephone calls at public stations in different locations in Charlotte, North Carolina. The telephone toll records introduced at trial showed that Summerford regularly made calls to Lowell Miller, a bookmaker and linesetter in Cullman, Alabama, followed by calls to Snider in Gastonia and to George in Rock Hill. On December 6 and 8, 1975, Snider was under surveillance in Gastonia. On each of these dates he was observed making a telephone call from a public telephone near his home, and both of these calls were billed to a number listed to Patricia Ridenhour in Charlotte. Toll records introduced at trial indicated that, during November and December, 1975, constant, almost daily calls were made from public telephones in Gastonia to Miller in Alabama and billed to the Riddenhour number.

With regard to appellant Honeycutt, the evidence introduced at trial showed that, during the period of the wire intercept, he made 13 telephone calls to Snider from his residence in Albemarle, North Carolina. In the course of these conversations, Snider

---

4. The various gambling terms referred to in this Opinion are explained in *United States v. Thomas* (8th Cir. 1975) 508 F.2d 1200, 1202, n. 2, *cert. denied* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 as follows:

"A 'bookmaker,' \* \* \* is one who accepts wagers, most commonly on sporting events.

"A bettor, in addition to the total bet, pays the bookmaker ten percent, which is the bookmaker's commission, the 'vigorish' or 'vig' or, sometimes, 'juice,' in the vernacular. Ideally, a bookmaker has an equal amount wagered on both sides of each event with the result that he has a ten percent profit, less expenses, and, ideally, loses nothing. In truth, betting is rarely equal on both sides and bookmakers may lose money, even to the point of their businesses being destroyed.

"To protect against losses, a bookmaker normally engages in 'lay off' betting whereby he passes on to another bookmaker the amount of bets by which his own 'book' is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa. The 'lay off' bet is therefore, in effect, bookmaker's insurance or reinsurance. Bookmakers, however, can . . . place personal wagers with one another which are not 'lay off' bets.

"The 'line' constitutes the 'odds' or 'handicaps' or 'point spreads' on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team. The 'line' is subject to change as a given event approaches and a bookmaker may alter the 'line' on a particular event in order to try and even out the money wagered on each side.

"Bookmakers may cooperate with one another by keeping their 'lines' consistent in order to avoid 'middling,' whereby a bettor, because there are two different point spreads on a single event, may bet and win on both competing teams \* \* \* ."

For an excellent discussion of the various aspects of a bookmaking operation, *see United States v. Box* (5th Cir. 1976) 530 F.2d 1258, 1260–62 and cases cited therein. Also, *see United States v. Milton* (5th Cir. 1977) 555 F.2d 1198, 1200–01; *United States v. McCoy* (5th Cir. 1976) 539 F.2d 1050, 1059–60 *cert. denied* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230.

provided line information to Honeycutt, and on two occasions Honeycutt placed bets with Snider. No search was made of Honeycutt's residence and the government was therefore unable to produce any documentary evidence that might show Honeycutt to be a bookmaker. However, the government argues that the identity of Honeycutt as a bookmaker and "lay-off" bettor[5] rather than as a mere bettor was established by terminology in two intercepted telephone conversations as explained by the government expert witness on gambling. Following is an excerpt of one conversation:

Snider: "Yeah. I pick up 6, and I got some action on the other side, and I bet on it myself. I give 3½ 4, trying to steal something myself.

Honeycutt: "Hell, I wouldn't take a chance getting hit in the crack, by God. I got 6 and held it."

In interpreting Honeycutt's statement about not wanting to "take a chance getting hit in the crack," the government witness testified that this refers to "some problem a bookmaker has in varying his line and taking bets that he doesn't get into a situation referred to as middling, where he gets bets at too widely varied lines and he can end up losing both bets."

A second conversation contained the following exchange:

Snider: "Miami 13½. Scratch Pittsburgh. Miami 4.

Honeycutt: "OK. Goddamn I'm going to get killed. . . .

Snider: "Why?

Honeycutt: "I'm loaded like a bear.

Snider: "On what?

Honeycutt: "On Pittsburgh.

Snider: "Why? Don't make no difference.

Honeycutt: "I might win anyway, mightn't I?

Snider: "Yeah. They'll probably put it back up on anyway. I'll probably have it up after awhile anyway.

Honeycutt: "Let me give you a number. If you put it on, call me and I'll give you some action.

Snider: "All right:"

In analyzing the above exchange, the Government expert witness testified as follows:

"As I recall the game, there were several calls talking about this one particular game, Pittsburgh against Los Angeles, and Los Angeles, I think supposedly had three of their running backs * * * injured. And for that reason, when there is a rather outstanding injury like that in a game, it's impossible to handicap that type of thing once the betting has taken place, so therefore they scratch the game or take it off the board; that is, the (sic) just allow no more betting. All the betting that has taken place at that time stays in effect, but the (sic) just don't dare let the betting continue because obviously most of the bettors would bet on the team that doesn't have the injuries, in this case, Pittsburgh. So the only thing they can do is scratch the game or take it off the board. What this individual is indicating is that he is . . . . .

* * * * * *

"He is saying he's loaded like a bear, I think the expression was, meaning he has a lot of bets on the game. Theoretically they would be bets, well, they could be bets on either side, but . . . . .

* * * * * *

"Most likely there would be a predominance of bets on Los Angeles, but at any rate, once the thing is off the board, that means if he doesn't take any more bets on it, he can't tend to even back up or get some kind of balance he wants to be in, and then they conclude, well, maybe they'll put the game back on the board and start taking bets on it and then maybe you can even it up, or maybe Los Angeles will win it anyway."

The evidence against appellant Barr, a resident of Kannapolis, North Carolina, consisted of gambling records and parapherna-

---

**5.** *See* note 4 *supra.*

lia and of tapes of seven telephone calls from Barr to Snider wherein Snider provided Barr with "line information" at the latter's request. No bets were made or discussed during these calls. For purposes of this appeal, Barr admits to being a bookmaker.

 Each of the appellants contends that the evidence introduced at trial was insufficient to sustain a jury finding that he was conducting an illegal gambling business within the meaning of 18 U.S.C. § 1955.[6] In reviewing the sufficiency of the evidence upon an appeal from a jury verdict of guilty, we of course examine the evidence in the light most favorable to the government. *Glasser v. United States* (1942) 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Sherman* (4th Cir. 1970) 421 F.2d 198, 199, *cert. denied* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78. It is also settled, in this Circuit, that circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence. *United States v. Bobo* (4th Cir. 1973) 477 F.2d 974, 989, *cert. denied* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774; *United States v. Chappell* (4th Cir. 1965) 353 F.2d 83, 84.

Appellant George placed no bets with Snider during the period of the wire intercept. He was, however, constantly acquiring "line information" from Snider; during the eighteen days of electronic surveillance, George called Snider fourteen times about the "line". The transcripts of two of these conversations (the relevant portions of which are set forth above) readily support the inference that George was routinely following Snider's instructions in setting his own "line". In each instance a discussion of the "line" regarding a certain football contest was followed by an instruction from Snider to George with respect to how George should set his "line". The second conversation, in particular, illustrates the extent to which George followed the "line" given to him by Snider; there, in response to Snider's instruction to "[m]ake it [the line] 5½ then," George replied, "[t]hat's what I'll do." On the basis of such language the jury could reasonably infer that George regularly followed the "line" given to him by Snider.

 By complying with the Snider "line", George helped to enhance the Snider risk-minimizing function; where the "lines" set by two bookmakers are identical, or nearly so, the bettors are unable to play off one "line" against the other to the disadvantage of the bookmakers involved.[7] Thus, evi-

---

**6.** Although the term "conduct" is not defined by the statute, the authors of simultaneously-enacted 18 U.S.C. § 1511, which was to parallel § 1955, intended "conduct" to mean any participation in the operation of a gambling business. H.R.Rep. No. 91–1549, 91st Cong. 2d Sess. (1970), 1970 U.S.Code, Cong. & Admin.News, pp. 4029–30. *See United States v. Ceraso* (3d Cir. 1972) 467 F.2d 653, 656; *United States v. Becker* (2d Cir. 1972) 461 F.2d 230, 232, *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208; *United States v. Riehl* (3d Cir. 1972) 460 F.2d 454, 459.

**7.** To illustrate: A bookmaker who set his "line" on a professional football game as favoring the Dallas Cowboys by 6½ points over the Washington Redskins would desire that other bookmakers in the same general betting area set their "lines" similarly. If, instead, another bookmaker set his "line" at Dallas by 9½ points over Washington, a bettor could take advantage of the variation by betting on Dallas with the first bookmaker (giving away 6½ points to Washington) and on Washington with

the second bookmaker (taking 9½ points from Dallas). The bettor would then be in a no-loss situation (assuming, of course, that the two bets were of equal amounts). If Dallas wins by seven to nine points, the bettor wins both bets, while if Dallas wins by more than nine points or if Dallas fails to win by more than six points, the bettor splits the bets and breaks even.

This calculation, obviously, does not take into account the 10% of the amount of the bet which the bettor must surrender to a bookmaker in the event of a losing bet. Nevertheless, the playing off of varying "lines" against one another presents bookmakers with the dual dilemma of a bettor possibly winning two bets without the chance of losing both, and of heavy betting on one's own "line" which cannot then safely be laid off on the other "line" to even the bets (as the bookmaker laying off bets is then in the position of losing both bets if the result of the contest falls in the middle of the two spreads—in the above case, if Dallas wins by seven to nine points).

For other discussions of the varied line situation and the importance to bookmakers of not

dence that George regularly acceded to the "line" which was constantly transmitted to him by Snider formed a sufficient basis upon which the jury could properly conclude that George was helping Snider to conduct an illegal gambling business within the meaning of § 1955.[8]

It should be noted, however, that the government also presented other evidence tending to implicate George in the conduct of Snider's gambling operation. A combination of physical surveillance evidence and toll records during September and October of 1975 showed that Summerford, one of Snider's gambling associates, established a pattern of calling Miller, a linesetter in Alabama, followed immediately by calls to Snider and George. This pattern of calls supports the inference that George had a priority greater than that of other bookmakers involved with the Snider operation in that he alone was privileged with an immediate notification by Summerford of the current status of the "line". The inference that these calls to Miller were in fact for the purpose of obtaining "line information" is strengthened by the fact that when Summerford discontinued his calls to Miller (allegedly because he became surveillance-conscious), Snider began making the calls.

Thus, there was sufficient evidence to support a jury finding that George would regularly accede to the "line" set by the Snider operation, one of whose principal operatives regarded George's position in the organization as sufficiently important to warrant the immediate transmittal to him of "line information" gained from a linesetter in Alabama. Surely, then, the jury was justified in finding that George was one of those conducting an illegal gambling operation within the meaning of § 1955.

The evidence presented at trial against Honeycutt also was clearly sufficient to support a guilty verdict under § 1955. The tapes of certain telephone conversations between Honeycutt and Snider, together with the expert testimony analyzing those conversations, provided a sound evidentiary basis upon which the jury could properly conclude that Honeycutt was a bookmaker who placed "lay-off" bets with the Snider operation. First, there was Honeycutt's statement to Snider that "I wouldn't take a chance getting hit in the crack * * *. I got 6 and held it." This statement, coming in response to Snider's remark in reference to his own point spread on a particular football contest, was sufficient to support the inference that Honeycutt was a bookmaker referring to the point spread at which he accepted bets on a particular game. The expert testimony analyzing this conversation as one dealing with a problem peculiar to bookmaking only confirmed what was already obvious: Honeycutt was a bookmaker.

The second conversation tended to show not only that Honeycutt was a bookmaker, but also that he was in the practice of "laying off" bets with the Snider operation in an effort to balance his books.[9] In analyzing this conversation, the government's expert witness testified that the "scratching" of a game by a bookmaker (i. e., his refusal to take any more bets on that game) leaves a bookmaker who has taken most of his bets on one team in a position where he cannot lay off these bets to the "scratching" bookmaker so as to even up his bets and minimize his risk on the outcome of the game; that in the instant case, Honeycutt's statement that "I'm going to get killed" because "I'm loaded like a bear . . . on Pittsburgh," indicated that, "most likely," he had made "a predominance of bets

---

allowing any larger variations than necessary, see *United States v. Bobo, supra*, 477 F.2d at 977, 990; *United States v. McCoy, supra*, 539 F.2d at 1061; *United States v. Box, supra*, 530 F.2d at 1261, n. 5.

**8.** *Cf. United States v. McCoy, supra*, where the Court reversed a § 1955 conviction, stating that the defendant "was not shown to have regularly accepted and used McCoy's [the head of the

gambling operation] line information, nor is there any evidence suggesting that [the defendant] would regularly accede to McCoy's line when given that information." 539 F.2d at 1062.

**9.** The relevant portion of that conversation is set out above.

on Los Angeles" (the team whose numerous injuries had led to the scratching of the game). The words of this telephone conversation, in conjunction with the expert testimony, support, if they do not command, the inference that Honeycutt was a bookmaker with a heavier than desired emphasis of bets on one side of a particular athletic contest and that he was attempting to lay off these bets with the Snider operation. Honeycutt actually made two bets with the Snider operation during the following ten days. Although the terse language surrounding these transactions provides no indication whether they were "lay-off bets," the fact that Honeycutt had earlier attempted to lay off a bet with Snider may be sufficient to support the inference that these bets were "lay-off" bets. Even without the presence of these two bets, however, the "loaded bear" conversation provided a sufficient basis for concluding that Honeycutt was in the practice of laying off bets with Snider.

 18 U.S.C. § 1955 applies to "[w]hoever conducts, . . . all or part of an illegal gambling business" which "involves five or more persons." The section "does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet." 1970 U.S.Code Cong. and Admin.News, p. 4029. In *United States v. McHale* (7th Cir. 1974) 495 F.2d 15, the Court was presented with a situation similar to the one presently before this Court. There, the defendant contended that, although he was a "lay-off" bettor and although bets of this kind are made between bookmakers, he was not "conducting" a gambling operation nor was he part of a five-person business. The Court disagreed, stating at p. 18:

> "The only exclusions intended by Congress were the individual player or bettor and not the professional bookmaker who also in the course of his business bets.

" 'Thus Congress' intent was to include all those who participate in the operation of a gambling business, regardless [of] how minor their roles and whether or not they [are] labelled agents, runners, independent contractors or the like, and to exclude only customers of the business.' *United States v. Becker*, 461 F.2d 230, 232 (2d Cir. 1972). 'As the House Committee Report stated, the term "conducts" is broad enough to include both "high level bosses and street level employees." ' *United States v. Hunter*, 478 F.2d 1019, 1022 (7th Cir. 1973) (includes runners, telephone clerks, salesmen and a watchman as 'conducting' a gambling operation).

"Certainly the lay off-bettor is a more obvious target of § 1955 than runners, salesmen, clerks, or watchmen."

Although this Court does not suggest that any bet between bookmakers is sufficient to bring them within § 1955, or that the laying-off of bets between a bookmaker and a non-bookmaker necessarily brings the latter within this section,[10] we are of the opinion that when a bookmaker lays off his own bets with another bookmaker, he comes within the scope of § 1955.[11] Accordingly, we hold that there was sufficient evidence to support Honeycutt's § 1955 conviction.

 The evidence presented at trial against Barr tended to show that Barr was a bookmaker, which he admits for purposes of this appeal. However, with respect to Barr, unlike George, there is no inference to be drawn from the tapes of his telephone conversation with Snider that he was regularly, or even occasionally, acquiescing in the line set by Snider; the tapes show only that, on seven occasions, Snider provided Barr with "line information" upon request. Nor does the evidence suggest that Barr laid off bets with the Snider operation; indeed, no bets of any kind were made or discussed. The case against Barr, there-

---

**10.** *See United States v. Box, supra*, 530 F.2d 1258.

**11.** In *United States v. Sacco* (9th Cir. 1974) 491 F.2d 995, the Court reached a similar conclusion, holding that the placement by the defend-

ant bookmaker of $6,570 in "lay-off" bets with an illegal gambling operation constituted sufficient evidence to sustain his § 1955 conviction as a conductor of that operation.

fore, consists basically of evidence showing that Barr was a bookmaker who sometimes received "line information" from Snider. The government argues, in effect, that the mere fact that the opportunity for "lay-off" betting is present may be used as a basis for a § 1955 conviction of someone in Barr's position. We disagree. Were the government's position adopted, a bookmaker might be found to be conducting an illegal gambling operation under § 1955 in combination with any and all bookmakers with whom he communicated,[12] for the opportunity for "lay-off" betting presumably exists as between any two bookmakers. We have found no case where the occasional acquisition of "line information" by one bookmaker from another has been held sufficient to bring the former within the scope of § 1955, and we decline to so hold now. Accordingly, Barr's § 1955 conviction is reversed.

The appellants also argue that the evidence presented at trial was insufficient to support their convictions for conspiracy to conduct an illegal gambling business in violation of 18 U.S.C. § 371. With respect to George and Honeycutt, the same evidence presented by the government in support of the substantive counts of the indictment was also sufficient to meet the conspiracy standard as set forth in the unchallenged instructions of the trial judge: "[I]n order to establish proof that a conspiracy existed [the government must show] that the members in some way or manner * * *, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful agreement" (*i. e.*, to operate an illegal gambling business). George's cooperation with Snider in setting the line and Honeycutt's "lay-off" bets bring these appellants within the scope of the conspiracy statute as it applies to § 1955.[13]

Barr's conspiracy conviction, on the other hand, must be reversed. The government showed no intent on the part of Barr to accomplish anything other than what he did. As the thing actually done (occasionally requesting and receiving "line information"), standing alone, does not constitute a § 1955 violation, the agreement to do that thing cannot be said to be an illegal conspiracy in contravention of § 371.

Appellant Honeycutt argues that he should have been granted a new trial, or at least an evidentiary hearing with respect thereto, pursuant to Rule 33, Fed.R.Crim.P. He argues that an expert witness in the area of gambling had agreed to testify for him to the effect that the comments made by Honeycutt to Snider in the two intercepted conversations as to which the government expert witness testified were fairly susceptible of various other interpretations consistent with innocence. There was no such expert testimony on Honeycutt's behalf at trial, he claims, because he was surprised by the content of the government expert witness' testimony.

 Whether to grant a motion for a new trial is within the discretion of the trial judge, and there is not even a hint of an abuse of that discretion in the present case. Honeycutt had an opportunity at trial to bring in his own expert witness to provide alternative interpretations of the intercepted conversations and to refute the interpretation offered by the government, but he failed to do so. And the fact that the government witness had been called to testify in similar trials on similar matters of interpretation should have put Honeycutt on notice as to what might develop at trial. Finally, although he now claims surprise, Honeycutt made no motion for a continuance at the time of the government expert witness' testimony or thereafter, and there is nothing in the record which indicates any effort by Honeycutt to secure attendance of an expert witness at trial who might have rebutted the government witness' interpretation of the evidence in question.

---

**12.** Assuming, of course, that the other requirements of § 1955(b) are met.

**13.** Indeed, George concedes on appeal that "[i]f those calls for line information were proof that George conducted part of Snider's operation, it would follow that those calls were also acts in furtherance of a conspiracy to conduct such business and George's convictions of both the substantive offenses and the conspiracy should be affirmed."

We find without merit Barr's contention that a reversal of his conviction in the present case calls for a reversal of the Trial Court's revocation of his probation and activation of a suspended sentence under a prior conviction in 1974.

Finally, the issue of requisite plurality need not be addressed, as this Court's affirmation of the convictions of two of the three appellants increases the total number of participants in the illegal gambling operation, by the appellants' own count, to the five person minimum.[14]

The convictions of the appellants George and Honeycutt are affirmed; the conviction of the appellant Barr is reversed but the revocation of his probation and activation of a suspended sentence under a prior conviction is affirmed.

---

14. 18 U.S.C. § 1955(b)(1)(ii). All three appellants conceded in their briefs that there were three participants in the illegal gambling operation. On oral argument, George admitted that there were four such participants, so that the affirmation of convictions in the present case brings his count of participants to six.