4 F.3d 986
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Christian Liviu BOTA, Defendant-Appellant.
 No. 92-5530.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 5, 1993.
Decided: August 23, 1993.
 
 Appeal from the United States District Court for the Western District of Virginia, at Abingdon. Samuel G. Wilson, District Judge. (CR-91-47-A)
 Argued: Louis Dene, Dene & Dene, Abingdon, Virginia, for Appellant.
 Jean Barrett Hudson, Assistant United States Attorney, Roanoke, Virginia, for Appellee.
 On Brief: Hope Dene, Dene & Dene, Abingdon, Virginia, for Appellant.
 E. Montgomery Tucker, United States Attorney, Thomas L. Eckert, Assistant United States Attorney, Roanoke, Virginia, for Appellee.
 W.D.Va.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant-appellant Christian Liviu Bota has appealed his conviction and sentence for making a false statement in order to obtain a loan in violation of 18 U.S.C. Secs. 2 and 1014. Bota was charged with falsely representing to Central Fidelity Bank in Abingdon, Virginia, the "true" purchase price of a hosiery mill he was seeking to acquire. On appeal Bota has asserted that there was insufficient evidence to prove several elements essential for a conviction under 18 U.S.C. Sec. 1014. He contends that the government presented insufficient evidence to prove (1) that the bank from which he sought the loan was a federally insured bank; (2) that he made a statement that was false; and (3) that the alleged statement was false as to a "material fact." Bota also has challenged the district court's computation of his sentence and its refusal to depart downward from the guidelines.
 
 
 2
 Bota worked in the real estate business primarily in Canada. Sometime in 1989, he and Jorge Goncalves, also involved in the real estate business in Canada, joined forces to pursue the purchase of the Damascus Hosiery Mill in Damascus, Virginia. Cecil Howell, a real estate broker from South Carolina, had informed Bota that the Mill, owned by brothers Ben and Carl Murphy, was for sale. According to the trial testimony, both Bota and Goncalves flew to Virginia and met with the Murphy brothers to inspect the property and to begin negotiations. Bota, however, essentially took the lead in all negotiations for the purchase of the Mill.
 
 
 3
 Much of the government's case-in-chief consisted of oral testimony from various participants in the negotiations. The Murphys testified that, at some point during the acquisition process, they and Bota decided on a purchase price of $1.25 million. According to realtor Howell, he was to receive 5% of that sale, or $62,500, as his brokering fee. Before a contract was signed, however, Bota, according to the testimony, added a $250,000 "consulting fee" to the $1.25 million. The Murphys testified that the "real purchasing price" of the Mill always remained $1.25 million. Bota asked the brothers not to reveal to Goncalves, whom they believed to be Bota's partner in the purchase of the Mill, the reasons for the $250,000 increase.
 
 
 4
 In addition, Bota arranged to have the substantial consulting fee paid out to a firm called Mid-Atlantic Consultants, Inc. Ben Murphy described the firm as the "fictitious company arrived" at by Bota. Mid-Atlantic had no employees and generated no business save for $50,000 deposited by Bota in May 1989, for the "commission on a sale." Howell arranged for an answering service for Mid-Atlantic in South Carolina, and Bota's friend Alan Power, chief officer of MidAtlantic, controlled the checking account. (Bota, according to the testimony, had no check cashing authority.) Bota further arranged for realtor Howell to "represent" Mid-Atlantic at the closing and thus to receive its check for the consulting fee. Howell attended the closing and in fact took the check for Mid-Atlantic as well the payment of $62,500 for his own services. Bota, however, met Howell outside by his car immediately following the meeting. There the realtor turned over to Bota the sizeable check made out to Mid-Atlantic. Bota shortly thereafter had Power deposit the money in Mid-Atlantic's account.
 
 
 5
 According to the testimony of the key parties involved in the sale, neither Goncalves nor the bank officials knew at the time of the closing that Bota had any association with Mid-Atlantic. Goncalves testified that he always believed the purchase price of the Mill was $1.5 million and that Cecil Howell was to receive $250,000 out of that money for his consulting work for the Murphys. Goncalves stated he was unaware of Bota's connection to Mid-Atlantic and to the $250,000 fee until several months after the closing.
 
 
 6
 The written contract signed by the parties and later introduced at trial showed only a total sale price of $1.5 million. In December 1989, Bota and Goncalves began negotiating with Central Fidelity Bank for a loan to finance the purchase. Although Goncalves considered Bota to be his equal partner in the purchase of the Mill, he agreed to present himself to the bank as the sole investor. Bota, on the other hand, represented to the bank that he would be working for Goncalves not as an agent or broker but as the plant manager of the Mill. According to Goncalves' testimony, Bota had told him that they could not use his name to obtain a loan because he had "bad credit" in Canada. As a result of the plan, only Goncalves and his wife became legally obligated under the loans.
 
 
 7
 Charles Brown and David Farris, officers of the bank, negotiated the loan with Bota and Goncalves. A total of $859,450 and a $50,000 line of credit ultimately were dispersed to Goncalves and to Bota. Under the arrangement with the bank, Goncalves also was to invest $200,000 in buyer financing into the project. Because Goncalves did not have extra cash, however, Bota told Goncalves that they would borrow the $200,000 from his mother. Both bank officers testified at trial that they had no knowledge prior to the closing that $250,000 of the purchase price was a consulting fee going directly to Bota. Perhaps most significantly, the bank also was given to understand that the transaction was one in which the purchaser, Goncalves, would participate in making up the purchase price. Actually, as things developed, because of Bota's $250,000 undisclosed commission, money flowed the other way.
 
 
 8
 In October, 1991, a federal grand jury returned an indictment against Bota, charging him with violating 18 U.S.C.Secs. 1344 and 2. On March 20, 1992, a federal grand jury returned a superseding indictment against Bota which charged him with two counts of making a false statement to obtain a loan in violation of 18 U.S.C. Secs. 1014 and 2.[1] Following a jury trial and a guilty verdict, Bota filed objections to the presentencing investigation report and also filed with the court a list of factors in support of a downward departure from the Sentencing Guidelines. The court overruled the objections. Bota was sentenced to 30 months imprisonment and a three-year period of supervised release. His appeal followed.
 
 I.
 
 9
 We must first address the jurisdictional question of whether there was sufficient evidence offered to prove that Central Fidelity Bank was a federally insured institution, as required for a conviction under 18 U.S.C. Sec. 1014.[2] See, e.g., United States v. Platenburg, 657 F.2d 797, 799 (5th Cir. 1981) (proof of federal insurance is not a mere formality but is a jurisdictional issue). At trial, no document showing FDIC status at the time of the alleged crime apparently was offered into evidence by the government. The government, however, called to the stand Charles Brown, Vice President and Commercial Banking Manager for Central Fidelity Bank. Brown was asked if Central Fidelity is federally insured. Brown responded"yes, it is." Bota raised no objection at that time to the relevancy of Brown's statement. Further, at the close of its case, the government discussed with the trial court the last-minute details remaining to be addressed. When the trial court reminded the prosecuting attorney that the government needed to establish "that the deposits were federally insured," the attorney responded: "We already did."
 
 
 10
 In view of existing authority on the issue, we find that there was sufficient evidence presented to support a jury finding that Central Fidelity was a federally insured institution at the time of the alleged crime. That is true even though the only evidence presented was the oral testimony of a bank official and even though the testimony referred to the current time-frame (i.e., that the bank "is" federally insured, not that it "was" federally insured). The sufficiency of the evidence is, of course, to be viewed in a light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Although the evidence presented was brief, the testimony of the bank official that the bank "is" federally insured is sufficient evidence to permit a jury inference and finding that the deposits "were" federally insured at the time of the alleged offense. In United States v. Safley, 408 F.2d 603, 605 (4th Cir.), cert. denied, 395 U.S. 983 (1969), we concluded that, when "viewed in context," a bank employee's testimony that the deposits "are" insured could permit a jury inference that the deposits "were" insured at the time of the alleged robbery. In the instant case, the time frame between the trial and the charged offense was roughly two years. The interval therefore between the present and the past, between "is" and "was," was not a great one, and a jury reasonably could have inferred FDIC status at the time of the false statement.[3]
 
 
 11
 Other courts also have permitted a finding that the deposits were federally insured at the time of the alleged crime on the basis of brief testimony. See, e.g., United States v. Sliker, 751 F.2d 477, 482-85 (2d Cir. 1984) (Oral testimony was offered that the bank's deposits "are" FDIC insured, and the court held that, when oral testimony is that the bank "is" FDIC insured, and the time-frame between the crime and the trial is not great, it is reasonable for a jury to conclude that the bank was federally insured at time of crime.), cert. denied, 470 U.S. 1058, 471 U.S. 1137 (1985); United States v. Knop, 701 F.2d 670, 672-73 (7th Cir. 1983) (The court found evidence of FDIC status sufficient even though the alleged crime had been committed over two years before the trial and even though the testimony was that the bank "is" federally insured.).
 
 
 12
 Although we are constrained to apply the law as it is, we warn that we also are not to stretch the law beyond its boundaries. The government, when prosecuting, probably runs no risk in producing testimony that the condition at the time of the alleged crime"was" the same as it now "is." A finding, however, that "is" includes "was," standing alone, is not only grammatically illogical, but it necessitates effort, in the way of searching the record, that could be more profitably spent on devotion to the merits of the case. Moreover, presenting clear evidence that a bank was federally insured at the time of the alleged crime simply should not prove to be one of the more difficult aspects of the government's case-in-chief. In short, this time the risk of reversal has been avoided, but we advise that, in the future, it would be wise not to take such a great yet easily avoidable gamble.
 
 II.
 
 13
 We next turn to the question of whether the government proved beyond a reasonable doubt that Bota made to Central Fidelity a false statement as to a material fact. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence should, of course, be viewed in a light most favorable to the prosecution. Id. Furthermore, we will consider both direct and circumstantial evidence and grant the government the benefit of reasonable inferences arising from the evidence presented. See, e.g., United States v. George, 568 F.2d 1064, 1069 (4th Cir. 1978) ("[C]ircumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence.").
 
 
 14
 In order to obtain a conviction under 18 U.S.C.Sec. 1014, the government must prove beyond a reasonable doubt (1) that the defendant made a false statement to a federally insured bank; (2) that he did so for the purpose of influencing the bank's actions; (3) that the statement was false as to a "material" fact; and (4) that the defendant made the false statement knowingly. See United States v. Whaley, 786 F.2d 1229, 1231 (4th Cir. 1986); United States v. Bonnette, 663 F.2d 495, 497 (4th Cir. 1981), cert. denied, 455 U.S. 951 (1982). Bota's position on appeal has been that the statement at issue was neither false nor material.
 
 
 15
 Count 1 of the indictment charged that Bota did represent to Central Fidelity the following: "[t]hat the purchase price of the Beaver Creek Hosiery Mill, 'a/k/a' Damascus Hosiery Mill was 1.5 million dollars when, in fact, the purchase price was 1.25 million dollars." Had the government been arguing a contract claim before a court, it would have been waging a tough battle, for a signed purchase and sales contract existed and was introduced showing a purchase price of $1.5 million. Bota, seeking in effect to utilize the parol evidence rule, has relied on that contract to show that the $1.5 million price was indeed the negotiated and the correct price. Moreover, he has asserted that there is no law prohibiting commission fees from the proceeds of a sale and that one cannot deduce therefore that the defendant's $250,000 consulting fee establishes a basis upon which to make the inference that the true sale price of the Mill was in fact $1.25 million.
 
 
 16
 The government, however, presented primarily testimony from the parties involved in the negotiations to demonstrate to the jury that the purchase price on the contract was, in effect, a"sham" price and that the "true" negotiated sale price for the Mill was $1.25 million. The jury thus was presented with evidence upon which it could have properly found that the document showing a $1.5 million sale price was in fact untrue and invalid. The testimony indicated that Bota and the Murphys had settled on a $1.25 million price and then agreed to inflate that price by $250,000 and to label the increase as a consulting fee for Bota's mock corporation, Mid-Atlantic Consultants. Ben Murphy, for example, testified at trial under an immunity agreement with the government and stated on direct and on cross-examination that the negotiated sales price had been $1.25 million. Bota, Murphy testified, told him that, as a "sales agent," he was adding $250,000 to the price. Murphy described Mid-Atlantic as the "fictitious company arrived at" by Bota and stated that Bota directed him not to mention the $250,000 increase for the "consulting fees" to his partner Goncalves. Murphy conceded that at the closing he made no mention to anyone of the arrangement. Carl Murphy also testified pursuant to an immunity agreement and confirmed the essential elements of his brother's story. In addition, Goncalves also confirmed the brothers' story. Goncalves testified that he had no knowledge that Bota was associated with MidAtlantic until several months after the closing.
 
 
 17
 Cecil Howell, the realtor who also was involved in the negotiations, testified that the parties agreed he was to receive as his brokering fee 5% of the purchase price, or $62,500, 5% of $1.25 million.
 
 
 18
 Howell testified he simply could not recall when or how the parties came to a $1.5 million sale price. In addition, Howell identified several documents introduced by the government. The correspondence between Howell and Bota shows a purchase price of $1.25 million and ultimately reveals the $250,000 consulting fee for Bota. Howell testified that, according to one of the documents, he agreed to represent Mid-Atlantic/Bota at the closing for the purposes of accepting the company's payment. Although he attended the closing, Bota thus did not take his consulting fee during the meeting. Instead, after the meeting, Bota met Howell outside as the realtor prepared to leave. At that time, Howell gave to Bota a check made out to Mid-Atlantic for $50,000.[4]
 
 
 19
 Finally, the loan officers involved in the loan application for the purchase of the Mill testified that they knew nothing of the above transactions. Both men thought the purchase price for the entire Mill was $1.5 million and stated they did not know that $250,000 of that money was not based on the value of the Mill but was being returned to Bota as a fee. Therefore the bank provided a loan of $859,450, erroneously believing that the sale price of the Mill was $1.5 million and that Goncalves would invest $200,000 into the project.
 
 
 20
 In short, despite the purchase and sales agreement, a rational jury could have found beyond a reasonable doubt that Bota made a false statement to Central Fidelity by misrepresenting to the bank that it was financing a project worth $1.5 million. A higher sales price, if anything, indicated that Goncalves, as the borrower, would have to come up with more financing, or at least not come up with less. In fact, Bota managed to reroute $50,000 to himself by directing $250,000 of the sham sales price to the Mid-Atlantic account. Accordingly, Bota's assertion that his statement was not false must fail.
 
 
 21
 Bota also has challenged the materiality of his statement to the bank. Whether a false statement is material is a question of law to be determined by the court. Whaley, 786 F.2d at 1231. Moreover, the bank need not have actually relied on the statement in order for the statement to be material. "Instead, the requirement of materiality is satisfied if the misstatement had the capacity to mislead the lending institution." Id. at 1232; see also Bonnette, 663 F.2d at 498 (actual reliance not required).
 
 
 22
 With regard to the false statement, the district court concluded that the statement was material. It further commented that the "purchase price obviously influences the decision as to what is to be loaned" and also that a jury therefore easily could have found that the statement "was made for the purpose of influencing the bank." Based on the testimony presented in the instant case, we agree with the district court that Bota's representation to the bank was material. Vice President and Commercial Banking Manager Charles Brown testified that Central Fidelity never knew of a $1.25 million price for the Mill until sometime after the closing. Further, he was unaware that a $250,000 consulting fee for Bota had been built into the Mill's purchase price. Brown also testified that the bank looked at many factors in reaching its decision to finance the purchase of the Mill, including the purchase price, the appraisals, the equity going into the loan, the presence of government contracts, and the value of the mill. Brown stated that, had the bank known that $250,000 of the purchase price was a consulting fee for Bota, it would have "questioned" the fee and the financing. Accordingly, the price, he concluded, would have been a material fact relevant to the decision to make the loan. In the totality of the circumstances, a true knowledge of what was falsely presented would have, in all probability, doomed the loan.
 
 
 23
 David Farris, a commercial loan officer at Central Fidelity at the time Bota and Goncalves sought financing, also testified for the government, and his testimony supported that of Brown. He, too, stated that it was the bank's understanding that it was financing a project valued at $1.5 million. Farris indicated that had Central Fidelity known of the real price of $1.25 million, the bank probably would have approved a loan but would have offered a smaller amount. Farris also testified that the bank's copy of the closing statement did not show a $250,000 consulting fee, minus a $200,000 deposit, for MidAtlantic. Instead, the bank's form showed only a total of a $50,000 fee for Mid-Atlantic. Further, the bank was told at the closing that Cecil Howell would be picking up the check for $50,000. Finally, Farris concluded that the substantial consulting fee would have made a difference and that the bank clearly "would not have wanted to" finance such a fee.
 
 
 24
 In short, according to the testimony, knowledge of the $250,000 consulting fee would have made a difference in the bank's decisionmaking process. In addition, the testimony of Brown and Farris that knowledge of the $250,000 augmentation in the price, alone, may not have foreclosed the entire loan but would have changed its amount does not take into account the numerous other falsities, which, if known, likely would have scotched the entire deal. The fact that the substantial consulting fee was undisclosed, for example, accompanied another key undisclosed piece of information: namely, that the fee was going to Bota, one of the key players in the purchase of the Mill. Even if Central Fidelity still would have agreed to provide some lesser amount of funding had they been informed of the $250,000 increase, that fact does not undermine the finding of materiality. See, e.g., Whaley, 786 F.2d at 1232. The false statement regarding the purchase price clearly "had the capacity to mislead," and thus we find that the requirement of materiality was established.
 
 III.
 
 25
 Bota's primary objection to the presentencing report and to his ultimate sentence was the calculation of the total loss for the purposes of determining the appropriate offense level under the Sentencing Guidelines. See United States Sentencing Commission, Guidelines Manual, Sec. 2F1.1 (Nov. 1991). "When the offense involves making a false statement, the inquiry to determine loss must focus on the amount of loss related to the false statement." United States v. Wilson, 980 F.2d 259, 262 (4th Cir. 1992); see also U.S.S.G. Sec. 2F1.1, comment. (n.7(b)) (noting that generally, "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan").
 
 
 26
 At sentencing, the district court calculated the total loss flowing from Bota's false statement to be $549,268.70.[5] Relying on the testimony of Central Fidelity Officer Charles Brown, the court reduced the first loan ($429,725) in light of the payment of $15,181.30 received by the bank. It further reduced the total by $145,000, which represented Central Fidelity's anticipated sale of equipment at the Mill. In addition, the court reduced the second loan ($429,725) by $200,000 in light of the bank's anticipated sale of the real estate at the site of the Mill. Finally, the court included in its calculations the loss of the $50,000 line of credit. The total loss of $549,268.70 required the addition of 10 levels to the base offense level of six. See U.S.S.G. Sec. 2F1.1(b)(1). Further, the court accepted the presentence report's recommendation to add two more levels because the offense involved "more than minimal planning" by Bota-a finding amply supported by the record. See U.S.S.G. Sec. 2F1.1(b)(2). Based on the above computations, Bota's final offense level was 18. With a Criminal History Category of I, Bota was eligible for 27 to 33 months imprisonment.
 
 
 27
 We do not find error in the district court's computation of the total loss. A court should not refuse to calculate the loss because it appears to be too speculative to resolve. The Application Notes to U.S.S.G. Sec. 2F1.1 state that a "court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. Sec. 2F1.1, comment. (n.8) (emphasis added); see also United States v. Rothberg, 954 F.2d 217, 219 (4th Cir. 1992) (stating the same). In the instant case the district court made a reasonable estimate of the loss that could be attributed to Bota's scheme to include a $250,000 fee in the sale price of the Mill. The bank did not know at the time it agreed to finance the purchase that $250,000 of the final purchase price of the Mill was to be directed as a consulting fee for Bota. The document it was shown at the closing showed only a $50,000 consulting fee going to Mid-Atlantic Consultants. Moreover, the bank believed that Goncalves had no other partner in the project and that he was investing his own $200,000 into the Mill. Under Bota's plan, the $200,000 in buyer financing was to come from the supposed loan from his mother. The money, however, never appeared. Charles Brown clearly stated at trial that had the bank "known all the circumstances in the purchase," it would have "questioned the financing." In light of the totality of the evidence, the bank's entire loss, minus any amount recouped, therefore could be properly considered.
 
 
 28
 Finally, Bota has asserted that there should have been a downward departure after he presented in writing and at the sentencing hearing mitigating circumstances he felt warranted a departure from the Guidelines. He has contended, moreover, that the district court did not merely refuse to depart downward but failed even to consider his request. In general, a district court's refusal to depart downward from a sentencing range calculated pursuant to the Guidelines is not reviewable. See, e.g., United States v. Meitinger, 901 F.2d 27, 29 (4th Cir.), cert. denied, 498 U.S. 985 (1990). The only exception to the general rule is for those cases in which the refusal to depart downward was based on the sentencing court's mistaken view that it lacked the authority to depart. See United States v. Bayerle, 898 F.2d 28, 31 (4th Cir.), cert. denied, 498 U.S. 819 (1990). Defense counsel has not contended nor is there evidence in the record to suggest that the district court thought it lacked authority to depart. Moreover, we note that, contrary to Bota's assertions, the district court at the sentencing hearing specifically explored the defense counsel's objections to the presentence report and the appropriate Guidelines range. It indicated to Bota's counsel that it had reviewed the lengthy objections made by the defense and stated that it also understood counsel's view that there were factors to consider in favor of a downward departure from the Guidelines. The district court listened as Bota made a lengthy statement "relative to [his] motion for a downward departure." Although the court at sentencing did not explicitly go through and reject each of the mitigating factors for downward departure filed by the defendant, that is not evidence that the court did not consider the defense's arguments for downward departure.
 
 
 29
 Accordingly, the judgment of guilt and the sentence imposed are
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Count 2 of the superseding indictment charged Bota with falsely representing to Central Fidelity that the Mill had, at that time, valid government contracts and was actively engaged in producing socks pursuant to government contracts. After the jury returned guilty verdicts on both counts, Bota filed a motion for judgment of acquittal. The court subsequently entered a judgment of acquittal as to Count 2 but denied the motion as to Count 1. The government has not appealed the grant of acquittal for Count 2
 
 
 [2]
 Section 1014 states in pertinent part:
 Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, ... commitment, or loan ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 
 
 [3]
 We also note that in Safley the court commented on the fact that the defendants objected in their motions for judgment of acquittal and on appeal only to the paucity of the government's proof on the FDIC issue. They had not objected at trial that the employee's testimony simply was irrelevant-a logical argument if the testimony had been taken literally. Safley, 408 F.2d at 605. Similarly, Bota did not object at trial that Brown's testimony that Central Fidelity "is" federally insured was irrelevant. In fact, based on the record, the issue of the bank's FDIC status does not appear to have been specifically raised until the instant appeal. In the proceedings below, Bota's attorney stated only in her motion for acquittal after discharge of the jury that the government had "failed to show all the aspects of the burden of proof."
 
 
 [4]
 According to Howell's testimony, the $50,000 represented the debt difference still owed to Mid-Atlantic at the time of closing. The government presented during Howell's testimony an invoice on Mid-Atlantic Consulting letterhead for a $250,000 consulting fee. The invoice noted a $200,000 payment received from Jorge Goncalves and credited to the account. That left outstanding only $50,000 to be paid at closing
 Jorge Goncalves' testimony confirmed that at the closing Mid-Atlantic was "owed" only $50,000. Goncalves stated that he first learned of the Mid-Atlantic consulting fee prior to the closing and that Bota told him the company operated under Cecil Howell. Goncalves said he "raised his eyebrow" at the $250,000 fee, but Bota explained to him that Howell had been consulting for the Murphys and the Mill for almost three years and that the Murphys had agreed to pay that amount. Goncalves concluded therefore that it was "none of his business" what the Murphys owed or did not owe because for him, as the buyer, the purchase price of the Mill simply remained $1.5 million. According to Goncalves, he was told by Bota that the $200,000-which they allegedly had borrowed from Bota's mother-already had been deposited in the Mid-Atlantic account. Thus, at the closing, Goncalves believed that the $200,000 which he and Bota had told Central Fidelity was going into the project had gone straight into the Mid-Atlantic account.
 
 
 [5]
 Central Fidelity actually dispersed to Goncalves and Bota two loans, each for the amount of $429,725. Central Fidelity had agreed to participate in the deal on a 50/50 basis with the Virginia Department of Housing and Community Agreement Agency. Both the loan from Central Fidelity and the loan from the state agency, known as an Industrial Development Authority Loan or a "bridge loan," were negotiated at the same time. At the closing Central Fidelity agreed to provide one loan to Goncalves and Bota for $429,725 and another loan of $429,725 on behalf of the state agency
 At the same time, Central Fidelity also closed on another loan, also in Goncalves' name, for $50,000. That loan was a line of credit which was funded sometime after the closing. In calculating the loss, the district court found that all of the loans had been negotiated as part of the same transaction and were thus relevant conduct under the Guidelines.